[Civ. No. 58773. Second Dist., Div. Five. Nov. 23, 1981.]

LOS ANGELES UNIFIED SCHOOL DISTRICT et al., Plaintiffs and Appellants, v.
GENE LIVINGSTON, as Acting Director, etc., et al., Defendants and Respondents.

## COUNSEL

John H. Larson, County Counsel, Richard K. Mason, Deputy County Counsel, Ron Apperson and Ada R. Treiger for Plaintiffs and Appellants.

George Deukmejian, Attorney General, Thomas E. Warriner, Assistant Attorney General, and Anne S. Pressman, Deputy Attorney General, for Defendants and Respondents.

## OPINION

**ASHBY, J.**—Appellants Los Angeles Unified School District et al. appeal from an order dissolving a temporary restraining order and refus-

ing to grant a preliminary injunction. (Code Civ. Proc., § 904.1, subd. (f).)

On January 31, 1980, an administrative law judge of the Employment Development Department of the State of California found that a number of employees of the school district, primarily substitute teachers, were eligible for unemployment compensation benefits for which they had applied during the summer of 1979, because appellant failed to prove that these employees had a "reasonable assurance" of employment for the next academic term. (Unemp. Ins. Code, § 1253.3, subds. (b), (c), (d), (f).)[1] On February 1, 1980, the school district appealed that decision to the California Unemployment Insurance Appeals Board (CUIAB). On February 4, 1980, appellant requested the superior court to issue a temporary restraining order and preliminary injunction to prevent the Acting Director of the Employment Development Department and the State Treasurer from paying out the benefits to the employees pending the district's appeal to the CUIAB. The complaint for an injunction alleged that the administrative law judge erred in finding the employees eligible for benefits and that appellant's remedy at law was inadequate because if the benefits were paid out pending the appeal, appellant would be unable to recover the costs charged to appellant on account of such benefit payments. After issuing a temporary restraining order, the trial court held a hearing on the preliminary injunction. On March 7, 1980, the court dissolved the temporary restraining order and refused to grant the preliminary injunction. Appellant appealed the trial court's order, and this court refused appellant's petition for a writ of supersedeas and application for stay. While the appeal to this court of the trial court's order refusing a preliminary injunction was pending, the CUIAB affirmed the determination of the administrative law judge that the employees were eligible for benefits. Appellant thereafter filed a petition in superior court for administrative writ of mandate (Code Civ. Proc., § 1094.5) to review the determination by the CUIAB.

■ The only order before us on this appeal is the order denying a preliminary injunction. Such an order does not adjudicate the ultimate rights in controversy and we express no opinion on the merits of the eligibility issue. (*Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512,

---

[1]Unless otherwise indicated, all section references hereafter are to the Unemployment Insurance Code.

528 [67 Cal.Rptr. 761, 439 P.2d 889].) ▮ Appellant argues that if benefits are paid out while appellant pursues its legal remedies in court, appellant will be irreparably injured because appellant's account will suffer a charge based on the benefits paid, which cannot be recovered even if appellant eventually vindicates its interpretation of the eligibility requirements. Appellant argues that therefore the payments should be enjoined pending the ultimate determination of the merits. We conclude, however, that this argument is contrary to the express requirements of the Legislature and to the fundamental purposes of unemployment compensation. The trial court did not err in denying the preliminary injunction.

Following an initial departmental denial of benefits, a full hearing was held before an administrative law judge who determined the employees were eligible for unemployment benefits. That determination had been appealed to the CUIAB. ▮ In such a situation, section 1335, subdivision (c), states that "such benefits shall be promptly paid regardless of any appeal." With respect to the present posture of the case, where the CUIAB has affirmed the referee's determination of eligibility, section 1338 is even more explicit. It states: "If the Appeals Board issues a decision allowing benefits the benefits shall be paid regardless of any further action taken by the director, the Appeals Board, or any other administrative agency, and regardless of any appeal or mandamus or other proceeding in the courts...." These requirements for the prompt payment of benefits after a determination of eligibility by a referee are necessary to achieve the purposes of unemployment compensation and to conform the state legislation to federal requirements. (*California Human Resources Dept. v. Java* (1971) 402 U.S. 121, 129-135 [28 L.Ed.2d 666, 672-676, 91 S.Ct. 1347]; *Gilles v. Department of Human Resources Development* (1974) 11 Cal.3d 313, 318-319 [113 Cal.Rptr. 374, 521 P.2d 110, 90 A.L.R.3d 970].)[2]

---

[2]Under federal law the Secretary of Labor may not make certification for payment of federal funds to a state unless the secretary finds that the law of the state and its methods of administration are "reasonably calculated to insure full payment of unemployment compensation *when due*; ..." (42 U.S.C. § 503(a)(1); italics added.) "[W]hen due" was interpreted by the United States Supreme Court to mean "when payments are first administratively allowed as a result of a hearing of which both parties have notice and are permitted to present their respective positions; ..." (*California Human Resources Dept. v. Java, supra,* 402 U.S. at p. 133 [28 L.Ed.2d at pp. 674-675].) Section 1335 was amended to conform to *Java (Gilles v. Department of Human Resources Development, supra,* 11 Cal.3d at p. 319.)

■ The purposes of the unemployment compensation insurance program, enacted by Congress, include enabling unemployed workers to tide themselves over while finding other employment, without resort to welfare or private charity, and preventing a decline in the purchasing power of the unemployed, which would adversely affect other industries. (*California Human Resources Dept.* v. *Java, supra,* 402 U.S. at pp. 131-133 [28 L.Ed.2d at pp. 673-675]; *Gilles v. Department of Human Resources Development, supra,* 11 Cal.3d at p. 325.) ■ To withhold these payments while the employer engages in the processes of appeal to the CUIAB and eventually to the courts would defeat the fundamental purposes of the act. (*California Human Resources Dept.* v. *Java, supra,* 402 U.S. at p. 133 [28 L.Ed.2d at pp. 674-675]; *Abelleira* v. *District Court of Appeal* (1941) 17 Cal.2d 280, 290 [109 P.2d 942, 132 A.L.R. 715].)[3]

■ An argument like the one made by appellant was rejected long ago by our Supreme Court in *Abelleira* v. *District Court of Appeal, supra,* 17 Cal.2d 280. In that case a referee had determined that the employees were eligible for benefits, and the employers, contending the employees were actually on strike and ineligible, had obtained a temporary restraining order from the Court of Appeal, withholding payment of the benefits. The Supreme Court issued a writ of prohibition against the Court of Appeal. Rejecting the employer's claim of irreparable injury, the Supreme Court cited the predecessor of section 1335 and concluded, "The very essence of the act is its provision for the prompt payment of benefits to those unemployed. Any substantial delay would defeat this purpose and would bring back the very evil sought to be avoided.... [¶] .... The legislature has concluded that it is wiser to have a system of unemployment compensation operating with a possible small percentage of error, than to have a system not operating at all." (*Id.,* 17 Cal.2d at pp. 298, 300; citation omitted; see also *American Federation of Labor* v. *Employment Dev. Dept.* (1979) 88 Cal.App.3d 811, 821 [152 Cal.Rptr. 193].)

---

[3]Appellant argues that there is no strong interest here in prompt payment of benefits because the initial determination by the department was to deny benefits, and thus payment was delayed in any event until after the administrative law judge's determination of eligibility and after a new school year had begun. However unlike subdivision (b) of section 1335, subdivision (c) is not limited to a referee's affirmance of a prior determination allowing benefits. The referee's decision rendered the payments due within the meaning of *Java* (fn. 2, *ante*) and therefore prompt payment was required under the terms of section 1335 and federal authority.

Appellant argues that the impact on the school district of erroneous payments of benefits to persons subsequently found to be ineligible is different from the impact of such payments on a private employer. This distinction, however, is an integral part of the alternative systems established by the Legislature for the financing of unemployment compensation benefits.

*Carleson* v. *Unemployment Ins. Appeals Bd.* (1976) 64 Cal. App.3d 145 [134 Cal.Rptr. 278], discusses the distinction between a tax rate employer and a reimbursement employer. Tax rate employers must pay a federal unemployment tax, must pay unemployment contributions into the unemployment fund, and must contribute additional amounts against a balancing account. (*Id.*, at p. 152.) A separate reserve account is maintained for each tax rate employer to which are credited all the contributions of the employer and to which are charged benefits paid to an unemployed individual. When benefits paid out are subsequently held to have been paid erroneously, the code is explicit that the tax rate employer's account is not to be charged with those amounts. (§§ 1335, 1338; *Carleson* v. *Unemployment Ins. Appeals Bd., supra*, 64 Cal.App. 3d at pp. 153, 155; *Abelleira* v. *District Court of Appeal, supra*, 17 Cal.2d at p. 298.)

Governmental instrumentalities and nonprofit organizations have the option of financing unemployment compensation benefits for their employees by means of the reimbursement method. (§§ 710, 801, 802, 803.) Under this method, reimbursement employers do not pay the federal tax or the contributions which are required of tax rate employers, but pay into the unemployment fund only that sum which is equal to the additional cost of benefits paid with respect to employment for such reimbursement employer. (*Carleson* v. *Unemployment Ins. Appeals Bd., supra*, 64 Cal.App.3d at p. 152.) This method of financing has certain advantages, but also corresponding risks. The employer using this method is required to shoulder the risk of overpayments such as payments made upon an erroneous determination of eligibility which is subsequently reversed on appeal. (*Carleson* v. *Unemployment Ins. Appeals Bd., supra*, 64 Cal.App.3d at p. 153; § 803, subd. (c).) The unavailability to such employers of the "noncharging" provisions applicable to private employers, is an integral part of the reimbursement financing method. (*Id.*, 64 Cal.App.3d at p. 155; see also *California Hospital Assn.* v. *Unemployment Ins. Appeals Bd.* (1979) 95 Cal.App.3d 270, 273-274 [157 Cal.Rptr. 38].)

A third method of financing is available to public school employers such as appellant. (§ 821 et seq.) According to the declaration of George Wolverton, chief of the school and government employees bureau of the Employment Development Department, public school employers may elect either this method (the School Employees' Fund), or tax rate contributions or direct reimbursement. The provisions for public school employers (§§ 821-832) are in part similar to the reimbursement method. Section 821, subdivision (a), parallels section 803, subdivision (b)(1), and, most importantly, section 821, subdivision (b), parallels section 803, subdivision (c), by stating expressly that no provision for the noncharging of benefits to the account of an employer shall apply.[4] The same language in section 803, subdivision (c), was interpreted in *Carleson* to mean that the reimbursement employer bears the risk of what the court termed "anticipated overpayments" including erroneous eligibility determinations. (*Id.*, 64 Cal.App.3d at p. 153.) Subsequently the Legislature amended sections 803 and 821 in a manner which strengthens that interpretation.[5] We conclude that under *Carleson* and subdivision (b) of section 821, school employers must also bear that risk.

 Thus although appellant will suffer a charge if the benefit payments are not enjoined pending judicial review of the determination of eligibility, this is actually one of the risks which appellant is required to

---

[4]Section 821, subdivision (b), states: "Sections 1030, 1031, and 1032.5, and any provision of this division for the noncharging of benefits to the account of an employer, shall not apply to an employing unit under subdivision (a) of this section. The cost of benefits charged to a school employer under this section shall include, but not be limited to, benefits or payments improperly paid in excess of a weekly benefit amount, or in excess of a maximum benefit amount, or otherwise in excess of the amount which should have been paid, due to any computational or other error of any type by the Employment Development Department or the Department of Benefit Payments, whether or not such error could be anticipated."

[5]In *Carleson* the court distinguished between "anticipated overpayments" which included payments pending appeal of erroneous determinations of eligibility, as in the instant case, and "error overpayments" which included computational errors exceeding the maximum benefits allowable. The *Carleson* court held that although a reimbursement employer was liable to reimburse the unemployment fund for "anticipated overpayments," such employer was not liable for "error overpayments" of the Employment Development Department. The Legislature subsequently amended sections 803, subdivision (c), and 821, subdivision (b), to provide explicitly that the employer be liable for the cost of either type of error. (See fn. 4, *ante.*) The Legislature, obviously aware of *Carleson*, reenacted and strengthened the language requiring reimbursement. (See *In re Marriage of Skelley* (1976) 18 Cal.3d 365, 369 [134 Cal.Rptr. 197, 556 P.2d 297]; *Ladd* v. *Board of Trustees* (1972) 23 Cal.App.3d 984, 990, 991 [100 Cal.Rptr. 571].)

assume as clearly spelled out by the Legislature as a condition of this alternative method of financing. The Legislature presumably has concluded that the costs to the employer of occasional errors may be outweighed in the long run by the advantages of alternative financing methods. The Legislature left the option to public school employers to weigh the risks and elect the system they prefer. If appellant concludes its present method is too risky, appellant may choose the contribution system or urge the Legislature to amend the provisions relating to school employers. The clear policy of the statute and well-established case law require that in order to achieve the fundamental purposes of unemployment compensation, the balance of equities pending judicial review of the merits must be weighted in favor of the unemployed worker. It is not a permissible solution to withhold the payment of benefits by injunction pending such review.

 There is no merit to appellant's argument that this financing system authorizes a gift of public funds in violation of article XVI, section 6 of the California Constitution. The second paragraph of that section specifically recognizes that certain forms of self-insurance involve risk taking,[6] and that a public entity can be unlucky in its insurance claims without being held to have made a gift of public funds.[7] As stated in *Abelleira* v. *District Court of Appeal, supra*, 17 Cal.2d at page 300, the Legislature determined that it is better to have a system of unemployment compensation operating with a possible small percentage of error than to have a system not operating at all. This important public purpose of the requirements for prompt payment renders inapplicable the constitutional provision on gifts of public funds. (See *Schettler* v. *County of Santa Clara* (1977) 74 Cal.App.3d 990, 1003-1005 [141 Cal.Rptr. 731].) The school employer method has other advantages which give the employer consideration for taking the risk

---

[6]When Congress enabled nonprofit employers to elect the reimbursement method of financing unemployment insurance, the Senate report called it "a form of self-insurance." (Sen. Rep. No. 91-752, 91st Cong., 2d Sess., reprinted in 1970 U.S. Code Cong. & Admin. News, at pp. 3606, 3618.)

[7]The second paragraph of article XVI, section 6 of the California Constitution states: "Provided, further, that this section shall not prohibit any county, city and county, city, township, or other political corporation or subdivision of the State from joining with other such agencies in providing for the payment of workers' compensation, unemployment compensation, tort liability, or public liability losses incurred by such agencies, by entry into an insurance pooling arrangement under a joint exercise of powers agreement, or by membership in such publicly-owned nonprofit corporation or other public agency as may be authorized by the Legislature; . . ."

of erroneous payments. (See *Winkelman* v. *City of Tiburon* (1973) 32 Cal.App.3d 834, 844-855 [108 Cal.Rptr. 415].)

The order is affirmed.

Stephens, Acting P. J., and Hastings, J., concurred.

A petition for a rehearing was denied December 14, 1981, and appellants' petition for a hearing by the Supreme Court was denied February 24, 1982. Kaus, J., did not participate therein.